UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

QURON MORRIS,

                              Plaintiff,                    1:17-cv-00371 (BKS/DJS)

v.

POLICE OFFICER JOHNSON: I.D. #2437, POLICE
OFFICER CHRISTO CORNELL: I.D. # 2363,

                              Defendants.
_____

**Appearances:**

*Plaintiff, pro se:*
Quron Morris
15-A-4139
Cayuga Correctional Facility
P.O. Box 1186
Moravia, New York 13118

*For Defendants:*
Abigail W. Rehfuss, Esq.
The Rehfuss Law Firm, P.C.
40 British American Boulevard
Latham, New York 12110

**Hon. Brenda K. Sannes, United States District Judge:**

MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Plaintiff Quron Morris, proceeding pro se, brings this civil rights action under 42 U.S.C. § 1983, raising claims arising from his September 2013 arrest by Albany Police Department ("APD") Officer Milton Johnson and Detective Christopher Cornell ("Defendants"). (Dkt. No. 15). Defendants now move for summary judgment under Federal Rule of Civil Procedure 56 on Plaintiff's sole remaining claims for false arrest. (Dkt. No. 46). Plaintiff did not respond to

Defendants' motion.[1] For the reasons that follow, Defendants' motion for summary judgment is granted.

## II. FACTS[2]

### A. The Shooting and Subsequent Investigation

On the night of September 13, 2013, City of Albany police reported to a residence located at 423 Clinton Avenue in Albany, New York (the "Residence") in response to a report of "shots fired." (Dkt. No. 46-8; Dkt. No. 46-5, at 1; Dkt. No. 46-1, ¶ 1). According to a police investigative report, when officers arrived on the scene, they observed "several projectile strikes into the residence." (Dkt. No. 46-8). A detective who responded to document the scene recovered one of the projectiles. (Dkt. No. 46-5, at 1).

According to an investigative report, police officers canvased the area. (Dkt. No. 46-7). One witness stated that he heard "one shot," but he could not identify anyone. (*Id.*). A second witness stated that she "hear[d] one shot and saw one black male walking west" on Clinton Avenue and stated that she was unsure of his first name but that his last name was Morris and that he goes by the street name "Bop." (*Id.*). A third witness stated that she "saw one black male fire one shot, and run west" on Clinton. (*Id.*). A fourth witness stated that he "[h]eard one shot

---

[1] Plaintiff's response to Defendants' motion for summary judgment was due on March 16, 2020. (Dkt. No. 46). On March 24, 2020, the Court issued a Text Order noting that Plaintiff had not filed a response to Defendants' motion and that Defendants had not sent Plaintiff the "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by Local Rule 56.2. (Dkt. No. 48 (citing N.D.N.Y. L.R. 56.2)). The Court directed the Clerk to mail the notice to Plaintiff and extended the response deadline to April 10, 2020. (*Id.*). Plaintiff did not respond. In light of Plaintiff's pro se status, the Court has conducted a thorough review of the record on summary judgment. *See, e.g., Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 56 F. Supp. 3d 515, 525 (S.D.N.Y. 2014) ("[B]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed. The district court has discretion to rely on other evidence in the record even if uncited. The district court must also determine whether the legal theory of the motion is sound.").

[2] The facts are drawn from the Defendants' submissions in support of their motion for summary judgment, as well as Plaintiff's verified Amended Complaint and attached exhibits. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

and observed on black male running west" on Clinton. (*Id.*). A fifth witness was home all night and "did not hear or see anything." (*Id.*).

According to an investigative report created on September 14th, the officers who responded to the scene located "several projectile strikes into the [R]esidence" and on "further investigation" located Janta Welcome "inside [the R]esidence hiding in fear." (Dkt. No. 46-8). The officers checked Welcome for injuries and "transported [him] to the detective office for an interview." (*Id.*). There, Welcome disclosed to police that "he was shot at by an individual whose nick name is 'Bop' after breaking up a fight that involved an individual named Naishawn Williams." (*Id.*; Dkt. No. 46-1, ¶ 4). Welcome identified "Bop" as Plaintiff Quron Morris and stated that "Mr. Morris [was] responsible for shooting at him tonight." (Dkt. No. 46-8). Welcome explained that Williams was Plaintiff's nephew and that Welcome had tried to break up a fight between Williams and "a fifteen-year-old female," which caused Williams to get "Bop." (*Id.*). Welcome stated that "words were exchanged thus causing 'Bop' to shoot into the house as [Welcome] stood in the doorway about fifteen feet away from 'Bop.'" (*Id.*). Welcome also "identified a firearm that resembled the firearm he observed to be possessed by [Plaintiff] at the time of the shooting which was a revolver." (*Id.*).

According to that same report, Defendant Detective Christopher Cornell interviewed Welcome's aunt, Williette Loyd. (*Id.*). Although the report states that Loyd was "not a direct witness to the incident," she identified "Bop" as Plaintiff through a photo array. (*Id.*; Dkt. No. 46-17, at 1–4). Loyd's signed photo array form states that Loyd "learned from [her] family that ["Bop"] is responsible for the shooting tonight." (*Id.* at 2). Loyd further stated that Plaintiff had recently been paroled. (Dkt. No. 46-8). Defendants have submitted evidence indicating that at

3

about 1:30 a.m., Cornell received a copy of Plaintiff's criminal record, which indicated that he had been paroled on July 29, 2013. (Dkt. No. 46-13).

Cierra Dale, Welcome's sister, lived at the Residence on the night of the shooting. (Dkt. No. 46-16 at 2; Dkt. No. 46-1, ¶ 7). On the morning of September 14th, Dale viewed a photo array and gave her account of what had transpired that evening. (Dkt. No. 46-16, at 2). Dale stated that Plaintiff "pulled out a gun in [her] hallway last night" after Welcome had a fight with Williams, who then brought Plaintiff to the house. (*Id.*). According to Dale, Welcome and Plaintiff "exchanged words" and "[a]fter [Welcome] said something to him, [Plaintiff] shot the gun into [Dale's] house towards [Welcome]." (*Id.*). Dale described the gun as "an old western style gun" that "was long and had the wheel in it where the bullets go." (*Id.*). She also stated that Plaintiff "had a glove around the handle." (*Id.*). Dale also identified Plaintiff, from a photo array, as the shooter. (*Id.* at 2, 4).

That evening, two APD officers—Sergeant Jones and Officer Martin—interviewed Williams. According to an investigative report, Williams denied any involvement in the "altercation . . . or even being in the area, stating that he never left his mother's house that evening." (Dkt. No. 46-9). Williams was shown a photo array that included Plaintiff, his uncle. (*Id.*). Williams stated that he did not "recognize any of the individuals" in the photo array. (*Id.*). He was then directed to Plaintiff's photo and "remained insistent" that he did not recognize anyone. (*Id.*). "When confronted with the fact that [one of the images] was in fact his uncle," he invoked his right to remain silent and declined to speak further. (*Id.*).

On September 16, 2013, Detective T. Haggerty conducted "inmate debriefs at the Albany County Correctional Facility." (Dkt. No. 46-10). While leaving the correctional facility Haggerty overheard two women discussing the shooting that took place at the Residence, one of whom

4

was Tracy Palmer. (*Id.*). After a brief introduction, Palmer informed the detective that she was present at the time of the shooting and would be interested in speaking further about the incident. (*Id.*).

The following evening, September 17th, Palmer met with three APD officers, including Cornell and Haggerty. (*Id.*). Palmer identified Plaintiff in a photo array and gave her account of the incident. (*Id.*; Dkt. No. 46-15 at 2). Palmer informed the officers that she was standing "at the gate" in front of the Residence when the shooting occurred. (*Id.*). Palmer stated that Plaintiff was "close to [her]" and fired two rounds at Welcome and "put holes in the windows of the house." (*Id.*).

### B.  Plaintiff's Arrest and Indictment

On September 21, 2013, Cornell and Defendant Officer Milton Johnson arrested Plaintiff.[3] (Dkt. No. 46-6, at 1; Dkt. No. 46-1, ¶ 12). Plaintiff alleges that he was riding his bicycle when Johnson cut Plaintiff off "while driving up in a vehicle." (Dkt. No. 46-4, at 4). Johnson then approached Plaintiff with his "gun drawn," telling Plaintiff to put his hands on his head. (*Id.*). Plaintiff complied. (*Id.*). Johnson read Plaintiff his *Miranda* rights while handcuffing him. (*Id.*). Plaintiff was never shown an arrest warrant nor told why he was being arrested. (*Id.*). Plaintiff contends that the officers lacked probable cause and made their arrest based upon uncorroborated hearsay. (*Id.* at 6).

Plaintiff was then "brought to Central Booking to be processed" and later arraigned in local criminal court on charges of criminal possession of a weapon in the second degree and reckless endangerment in the first degree. (*Id.*). According to New York Supreme Court Judge

---

[3] In his verified Amended Complaint, Plaintiff asserts that he was arrested on September 28, 2013; the arrest report Defendants submitted with their motion for summary judgment motion states that Plaintiff was arrested on September 21st. (Dkt. No. 46-4, at 4; Dkt. No. 46-6, at 1). Any dispute regarding the date of the arrest is immaterial.

Thomas A. Breslin's decision and order in Plaintiff's criminal proceeding, Cornell testified to the Grand Jury "concerning identifications made by witnesses of the shooting." (*Id.* at 10–11). None of the eyewitnesses at the Residence were called during Plaintiff's grand jury proceedings. (*Id.* at 10; Dkt. No. 46-1, ¶ 14). On March 12, 2014, Plaintiff was indicted for second-degree criminal possession of a weapon in violation of N.Y. Penal Law § 265.03(1)(b).[4] (Dkt. No. 46-4, at 8–9).

### C.     Dismissal of Charges Against Plaintiff

Following the indictment, Plaintiff was imprisoned for one year at the Albany County Correctional Facility "without bail or any prospect of being released." (*Id.* at 6). On August 18, 2014, Judge Breslin granted Plaintiff's unopposed renewed motion to dismiss the indictment against him, finding that Cornell's "testimony concerning identifications made by witnesses was hearsay and not competent evidence" and as a result the evidence against Plaintiff "was not legally sufficient." (*Id.* at 10–11). On August 18, 2014, the indictment against Plaintiff was dismissed and sealed. (*Id.* at 11–12; Dkt. No. 46-1, ¶ 15). On September 21, 2014, Plaintiff was released from custody. (Dkt. No. 46-4, at 6).

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

---

[4] A person is guilty of criminal possession of a weapon in the second degree under N.Y. Penal Law § 265.03(1)(b), a class C felony, when he possesses a loaded firearm "with intent to use the same unlawfully against another."

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.   DISCUSSION

Defendants argue that summary judgment is proper on Plaintiff's false arrest claim because Defendants had "trustworthy facts and information" which established probable cause for his arrest. (Dkt. No. 46-2, at 5–8). The Court agrees.

To prevail on a Fourth Amendment false arrest claim, a plaintiff must establish that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (Sotomayor, J.) (quoting *Weyant*, 101 F.3d at 852). In analyzing probable cause, a court "must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). A court "should look to the 'totality of the circumstances' and 'must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).

"[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," *id.* (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)), unless the circumstances raise doubt as to the person's veracity. *Id.* (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)); *Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). "The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)).

In this case, the uncontested evidence shows that when Plaintiff was arrested, Defendants had the following information in their possession. Welcome (whom Plaintiff allegedly fired at), Dale, and Palmer—who were all present during the incident—provided officers with eyewitness accounts of the shooting and each identified Plaintiff from a photo array as the shooter. (Dkt. No. 46-8; Dkt. No. 46-16, at 2; Dkt. No. 46-15, at 2). *Singer*, 63 F.3d at 119; *Panetta*, 460 F.3d at 395; *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest."). Loyd also identified Plaintiff in a photo array and stated that she "heard from [her] family [Plaintiff] is responsible for the shooting." (Dkt. No. 46-17, at 2).

Moreover, the information provided by Welcome, Dale, and Palmer contained significant overlap. Welcome and Dale both stated that a fight had transpired directly before the shooting. (Dkt. No. 46-8; Dkt. No. 46-16, at 2). Welcome, Dale, and Palmer all stated that Plaintiff was outside the house and shot inside towards Welcome. (Dkt. Nos. 46-8, 46-15, 46-16). And Welcome identified the gun as a revolver, (Dkt. No. 46-8), which Dale corroborated when she described the gun used as "an old western style gun" that "had the wheel in it where the bullets go." (Dkt. No. 46-16, at 2). *Smith v. Ware*, No. 17-cv-5152, 2019 WL 2616194, at *4, 2019 U.S. Dist. LEXIS 106897, at *11 (S.D.N.Y. June 26, 2019) (granting summary judgment on a plaintiff's false arrest claim where the defendant officer had testimony from three witnesses, "two of whom filed criminal complaints with the NYPD, and each of whom offered accounts of the scheme that corroborated the others' stories" and where the plaintiff did "nothing to establish that [the defendant] had any reason to doubt the veracity of any of these witnesses"). Clearly, Defendants were armed with "reasonably trustworthy information" that Plaintiff had committed a crime. *Jaegly*, 439 F.3d at 152 (quoting *Weyant*, 101 F.3d at 852), and nothing in the record

"raise[s] doubt as to the [witnesses'] veracity." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Panetta*, 460 F.3d at 395).

Plaintiff's verified Amended Complaint alleges that these identifications are uncorroborated hearsay and are insufficient to establish probable cause. (Dkt. No. 46-4, at 6). This assertion is unpersuasive. "[A] police officer's judgment as to probable cause, unlike a criminal complaint, may be based on hearsay evidence, upon suspicious circumstances and upon probabilities."[5] *Velaire v. City of Schenectady*, 862 F. Supp. 774, 780 (N.D.N.Y. 1994). Here, no reasonable juror could conclude that the Defendants lacked probable cause to arrest Plaintiff. Accordingly, Defendants are granted summary judgment on Plaintiff's false arrest claims.[6]

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 15) is **DISMISSED** in its **ENTIRETY**; and it is further

**ORDERED** that the Court Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: July 30, 2020
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[5] To the extent Plaintiff asserts that his arrest was unconstitutional because Defendants did not "show [him] an arrest warrant," (Dkt. No. 46-4, at 4), that proposition likewise fails. "[T]he Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *Fla. v. White*, 526 U.S. 559, 565 (1999).

[6] As there is no genuine, material dispute of fact as to whether Defendants violated Plaintiff's Fourth Amendment rights, the Court does not reach Defendants' qualified immunity argument. (Dkt. No. 46-5, at 9–10).

10